William A. D'Alton
D'ALTON LAW FIRM, P.C.
3970 Avenue D, Suite C
Billings, MT 59102
Tel (406) 245-6643
Fax (406) 245-6693
Email:  bill@daltonlawpc.com

*Attorney for Plaintiff Jennifer Kransky*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | | |
|---|---|---|
| JENNIFER KRANSKY, | ) | Case No.  CV-23-116-BLG-SPW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **AMENDED COMPLAINT** |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW Plaintiff Jennifer Kransky for her Amended Complaint against

Defendant, alleges and states as follows:

## NATURE OF THE ACTION

This is an action brought pursuant to the FTCA to recover compensatory

damages for the extreme and outrageous tortious acts and omissions of employees

of the Defendant during the investigation and ultimately wrongful prosecution of

Jennifer.  The Defendant, through its agents and employees, committed torts

cognizable under Montana law by working in concert to divert blame for erroneous acts committed by VA employees, including failure to adequately staff VA facilities necessary for the care and proper treatment of veterans, and the cover up "systemic mismanagement or abuse at the VA Medical Center that potentially allowed multiple instances of substandard care to occur."

While Jennifer does not allege a constitutional tort in this action, the unconstitutionality of some of the acts and omissions by Defendant's employees and agents is relevant to ancillary matters of law including the absence of a discretionary function.

The violation of Jennifer's constitutional rights, while not alleged as independent actions, prevents the agents and employees of Defendant and thereby Defendant from immunity protection.

## PARTIES, JURISDICTION, AND VENUE

1.    Jennifer is a citizen of the State of Montana, residing in Custer County, Montana, which is within the Federal District Court of Montana, Billings Division.

2.    This Court has subject matter jurisdiction over Jennifer's FTCA claims under 28 U.S.C. §§ 1346(b)(1),  2679(b)(1), 2679(d)(2), 1441(a), and 1446(a).

3.    Venue is proper in the United States District Court for the District of Montana Federal Court because a substantial part of the acts or omissions giving rise to Jennifer's claims occurred in this District.

## ADMINISTRATIVE EXHAUSTION

4.    Pursuant to 28 U.S.C. §§ 2401(b) and 2672, Jennifer properly filed an

administrative claim with the Federal Tort Claims Act Section of the DOJ, the

agency of which the VA is a part.

5.    On December 14, 2022, Jennifer filed her federal tort claim.

6.    On October 5, 2023, the VA denied Jennifer's federal tort claim.

Accordingly, Jennifer has exhausted her administrative remedies.

## FACTS

7.    The VA employed Jennifer as a nurse from July 25, 2004, until the

VA terminated her employment on June 23, 2022.

8.    Over her 18 years as a VA nurse, Jennifer worked at the VA

Community Living Center (CLC) located in Miles City.   A CLC is often referred

to as a nursing home.

9.    Over Jennifer's 18 years as a VA nurse, Jennifer's performance was

exemplary.

10.    Jennifer's performance evaluations were excellent.

11.    The VA rated Jennifer as an "Outstanding Employee" for 2019, 2020,

and 2021.

12.    Due to her outstanding performance, Jennifer was allowed into the

VA's Executive Career Field Performance Program.

13.    To improve the quality of care at the Miles City CLC, Jennifer pushed and hounded the Helena VA to fill all the positions at the Miles City CLC to stay compliant with federal regulations and to provide the highest and best care to the Veterans.

14.    Even with her efforts to force the VA to fill positions, the Helena VA failed to fill all the positions at the Miles City VA at the time of her suspension.

15.    The VA's failure to fill positions at the Miles City CLC caused a temporary closure of the Miles City CLC.

16.    On June 2, 2021, Jill Tholt, Associate Chief Nurse, who works at the Helena VA, sent to Kiersten Taylor,  who was the Chair of the Montana VA Nursing Professional Standards Board, Jennifer's two-year review as manager of the Miles City CLC.  Tholt's findings were issued about six months before Jennifer was placed on administrative leave for allegations of Veteran abuse.

17.    Taylor concurred with the following finding by Tholt.

A.    Jennifer "consistently assessed safety and restrictive practices with the CLC environment."

B.    "Because of [Jennifer's] incredible dedication and ability to respond, as of March 6, 2020 the VA Miles City has met all required memoranda's set forth by VISN and VA Montana."

C.    Due to Jennifer's management abilities, "staff felt more engaged and 'safe' while proving (sic) care to the Veterans."

D.   "As Nurse manager of the Community Living Center, [Jennifer], with her dedicated team, work to support a safety culture to learn, inquire, and improve Veteran care."

E.   Jennifer "fostered an environment with her staff to create a culture to support staff to 'speak up' giving her team a strong voice to create change."

F.   Jennifer and her dedicated staff have responded to all White House Hotline (WHH) complaints exceeding the 95% rate by answering within 72 hours of receiving the complaint. Each complaint is tracked by Ms. Kransky and her IT Member with appropriate action taken immediately with communication to all staff and Veteran for all positive reviews. During this past rating period, the CLC went from 8 WHH complaints in FY19 to 2 in FY20.  Only one of these complaints was related to the quality of care and was immediately resolved with positive reviews.

G.   No Veterans, under Jennifer's watch, were infected by COVID.

H.   Jennifer identified that CLC note titles and templates were outdated and not meeting performance standards, and thereby implemented a standardized nursing documentation process to assess, plan, implement, and evaluate veterans on the unit.

I.   Jennifer worked with nursing staff to identify patient information not being communicated appropriately and fixing the incomplete documentation and inconsistent charting.

J.   As a result of Jennifer's "keen leadership, notes titles were streamlined to be in compliance with documentation needs and functional templates that are in alignment with standards using the most up to date evidence based practice for Community Living Centers have been updated for the CLC in CPRS."

K.   "During the past rating period the CLC has seen quality measures go from a 1 Star to a 3 Star."  Jennifer "and her team had a deficiency free Long Term Care Institute (LTCI) survey for 2020," which was achieved for four consecutive years.

L.    Jennifer completes all proficiency and communicates ratings to her employees.  Jennifer is proactive in communicating performance standards to all nursing staff.

M.    Jennifer "meets with employees on a regular basis to discuss progress towards both their professional and personal goals."

N.    Jennifer "provides positive feedback, gives awards, and discusses successes in morning huddle with all the staff as well as the IT team."

O.    Jennifer, as the leader of the CLC, provided transparency, which helped "develop state wide interventions to reduce error in medication passing and ensure that any reporting of errors that may occur do not reach our Veterans and cause harm."

18.    On December 7, 2021, the VA received a report of abuse of a Veteran at the Miles City CLC.  The report was made by Ms. Haydal, who was the activities director at the time and who no longer works for the VA.  Ms. Haydal never witnessed any of the allegations she reported.

19.    Upon the report of allegations of abuse of a veteran, the VA assigned a VA officer from the Billings VA to travel to Miles City to investigate the allegations.

20.    Officer Colin Norris was sent to investigate.

21.    After serving in the Air Force, Officer Norris joined the VA police force.

22.    At the time he was sent to Miles City, Officer Norris had conducted between 25 and 30 investigations over his three and a half years as a VA police officer.

23.    Officer Norris is not POST certified.

24.    Officer Norris arrived in Miles City on December 9, 2021, to conduct his investigation.

25.    He interviewed a number of persons who did not have personal knowledge of the allegations made.

26.    Officer Norris interviewed CNAs Nicole Chavez, Brenda Schwab, and Amy Stephenson.  All three gave contrived, false, and misleading statements to Officer Norris and later to the AIB.

27.    The false and misleading statements were never questioned or challenged by those with decision making authority at the VA.

28.    Critical to protecting Jennifer's constitutional rights, including her due process rights, the VA was required to complete an objective, complete investigation on the complaints by Mary Haydal.

29.    Defendant's violation of Jennifer's constitutional rights negates any immunity defense the United States may attempt to raise.

30.    Officer Norris interviewed the Veteran at the center of the complaint.

31.    The Veteran stated a nurse berated him, but he did not identify Jennifer as that nurse.

32.    In his statement to Officer Colin Norris, R.D identifies the nurse who was treating him horribly as a redheaded nurse.

33.    R.D. gives a statement to Officer Colin Norris on December 9, 2021.
Norris wrote: "[R.D.] informed me that at some point in the appointment, a red-
haired nurse got into his face, and began berating him."

34.    Officer Norris did not tape the interviews.

35.    Officer Norris did not interview the nurses who were present for the
alleged abuse.

36.    Officer Norris was instructed not to complete the investigation
because he was told by his supervisor that the Office of Inspector General was
taking over the investigation and completing it.

37.    Even though the Office of Inspector General was taking over the
investigation, Defendant relied upon the incomplete and erroneous investigation by
Officer Norris to prosecute Jennifer.

38.    On December 14, 2021, Jill Tholt, gave notice to Jennifer that Jennifer
was temporarily assigned from patient care/Nurse Manager to administrative duties
while an official investigation was conducted.

39.    On January 13, 2022, Judy Hayman assigned Kiersten Taylor,
Kenneth Fenstermacher, and Elizabeth Estes as members of the Administrative
Investigative Board (AIB) to investigate alleged abuse at the Miles City CLC.  Dr.
Hayman attached to her January 13, 2022, letter, the uncompleted report by Officer
Norris.

40.    Dr. Hayman tasked the AIB with investigating: (a.) Allegation of
patient abuse on or about December 7, 2021, to Veteran Patient R.D.; and (b.)
review clinic operations/personnel/patients for possible past incidents of patient
abuse of the same nature as Veteran Patient R.D.

41.    The AIB issued its findings and recommendations on March 9, 2022.

42.    The AIB issued Finding of Fact #8, which stated:

> **Finding of Fact # 8**:  Nurse Manager Jennifer Kransky addressed
> Veteran's yelling and calling staff names.  Staff reported she was
> "not kind about it" ; got "in his face" and "shook her finger at him".
> Veteran felt he was being berated.

43.    The AIB's Finding of Fact #8 was not factual at all.  These "facts" were
created by Nicole Chavez, a disgruntled employee.

44.    The AIB investigation was deficient in many ways.

45.    For instance, Janet Haughian, when interviewed by the AIB, was not
asked any questions about the abuse of Veterans.  If she had been, Ms. Haughian
would have cleared up the erroneous facts given to the AIB by a couple of CNAs
who vehemently disliked Ms. Haughian because Ms. Haughian made them do their
jobs.

46.    Nicole Chavez, Brenda Schwab, and Amy Stephenson all made false
and misleading statements to the AIB.

47.     One CNA told the AIB that after she reported events of alleged abuse, Jennifer came into work the next day and retaliated against her.  The CNA's statement was false.  Jennifer was not at work at the time because she had taken a sick day.  Again the AIB failed to pick up on these inconsistencies.

48.     Chavez, Schwab, and Stephenson alleged Ms. Haughian abused a Veteran on December 6, 2021.

49.     Ms. Haughian was not even present at the time of the allegations.

50.     Natalie Stein was the nurse on December 6, 2021, who "berated" R.D, a fact that Schwab and Stephenson knew, but covered up.

51.     When giving false statements, Chavez, Schwab, and Stephenson cannot claim immunity because they violated Jennifer's constitutional rights.

52.     Defendant used the false allegations against Ms. Haughian in support of the Defendant's reason for Jennifer's discharge, which surfaced four months after her discharge.

53.     Even with the deficient investigation by the AIB, the final AIB report did not recommend terminating Jennifer's employment.

54.     On April 21, 2022, the Billings Gazette reported:

> The U.S. Department of Veterans Affairs in Montana has temporarily closed the Veterans long-term care center in Miles City following concerns over patient safety, the agency said Thursday. In December, the VA's regional office received a self-report from the facility over concerns for patient safety. The VA did not disclose

the nature of the concerns or whether any veterans were harmed as a result of the concerns other than to say they were valid.

The VA reportedly investigated the situation at the CLC in Miles City through an administrative review process, deemed the concerns justified and decided to move the veterans at the facility to other long-term care centers, according to Montana VA spokesperson Matt Rosine.

"In Dec. 2021, Montana VA identified concerns with patient safety. VA pursued multiple processes to include inspections, investigations, and inquiries to fully evaluate the CLC," read a press release Thursday afternoon issued in response to questions from the Billings Gazette.

After the veterans have been moved from the home, the temporary closure will allow the VA to recruit, train and increase staffing requirements to the level of care the VA deems necessary to reopen the living center.

"The safety and well-being of our veterans is our highest priority. Due to staffing challenges, we are unable to ensure that a critical level of high-quality care can be provided to residents," said Montana's VA Executive Director Dr. Judy Hayman via the press release. "We are proactively transitioning Veterans to other locations based on their and their families' preference."

Currently the home, which treats long-term patients in need of skilled-nursing and complex care, is home to 14 veterans. The facility employs 40 people but has staffing shortages in five areas, according to the VA. Those include physical therapy, social work, nursing leadership, nurse educator, and recreation therapy.

Sen. Steve Daines' office said they were aware of the closure in Miles City and the Senator is looking into the situation. He added in a statement that he "is committed to doing everything he can to support and care for Montana's veterans."

Sen. Jon Tester's office said they were also aware of the closure Thursday and the Senator had been in contact with Department of Veterans Affairs officials to look into the situation.

"I'm deeply concerned with what has transpired at the VA's Miles City Community Living Center. The issues that have been brought to my attention and to that of VA leadership are unacceptable, and I'll be working to hold anyone found responsible of wrongdoing accountable."

55.    Over the two years Jennifer managed the CLC, her constant requests to the Helena VA to fill needed positions at the CLC were ignored.

56.    Dr. Hayman, on April 22, 2022,  a day after newspapers across Montana ran the article about the Miles City CLC, stated that an OIG inspection was ongoing and that when she had the OIG's findings, she and the VA would hold the "responsible actors accountable."

57.    The OIG issued its report on January 26, 2023.

58.    Regarding the Veteran who was the center of the investigation in Miles City, he should have never been sent to the Miles City CLC for skilled rehab.

59.    He was terminally ill, which the VA in Helena knew or should have known if medical personnel at the Helena VA were doing their jobs.

60.    The OIG was very critical of how the VA in Helena treated R.D. along with other Veterans.

61.    Here is R.D.'s medical timeline prior to his arrival at the CLC in

Miles City:

       Day 1-An X-ray when he presented to the ER Department.

       Day 3- repeat chest X-ray.

       Day 4- chest imaging repeated

       Day 5- Transferred to ICU

       Day 6- improved with daily chest X-rays from Day 7-9, with
       changes.

       Day 13-worsening condition with increased oxygen need.

       Day 17- transferred back to med surge floor.

       Day 34- transferred to the CLC for Short Stay Rehabilitation with
       goal to return home.

62.    R.D. was terminally ill, which the Helena VA should have known if

his scans were reviewed.

63.    The OIG found during R.D.'s first hospitalization at the end of

November 2021, a radiologist documented changes in R.D.'s x-rays, but

apparently, no one at the Helena VA addressed R.D. serious illness until it was too

late.

64.    The OIG found that Helena failed to provide routine medical care to

the Veteran.

65.    Furthermore, the Helena VA care of Veterans in many ways was

substandard.

66.    While the AIB did not recommend the termination of Jennifer's employment, Jill Tholt, on June 1, 2022,  recommended the termination of Jennifer's employment.

67.    Jill Tholt is the Associate Chief Nurse of Inpatient/Specialty Care.

68.    While the AIB charge was limited to two issues, Jill Tholt with the assistance of Mona Wilson, who is an HR Generalist out of Denver, Colorado, created reasons to terminate Jennifer's employment.

69.    Jennifer became a convenient and necessary diversion and scapegoat for the Defendant.

70.    Dr. Hayman, in her June 22, 2022, Removal Decision, stated Jennifer was "responsible for performing [her] duties professionally . . ."  Dr. Hayman found Jennifer did not perform her duties professionally or competently.

71.    Dr. Hayman alleged Jennifer " failed to treat Veteran patients with the respect and dignity they deserve. . ."   Dr. Hayman alleged Jennifer "failed to treat members of the patient care team with the respect and professionalism they deserve."

72.    In January of 2023, the OIG issued its report concerning the care of Veterans in Montana.

73.    After the OIG issued its report, by October of 2023, Dr. Hayman was relieved as the Director of the Montana VA.

74.     On October 3, 2023, and then again on November 6, 2023, The Billings Gazette reported "among the issues surfacing ahead of leadership change was Montana VA's hiring of a felony sex offender once featured on the TV show "To Catch a Predator. When a concerned employee questioned Hayman about the hiring that employee was told to keep quiet."

75.     The Gazette reported:  "In one case a veteran diagnosed with COVID-19 was later determined at a private hospital to also have terminal metastatic lung cancer."

76.     On November 6, 2023, the Gazette entitled its article "Concerns about Montana VA healthcare persist even with former director's ouster."

77.     Jennifer's "ouster" had nothing to do with how she performed as a VA employee.

78.     Shortly after Jennifer filed her appeal contesting her termination, the Defendant decided Jennifer should be prosecuted.

79.      On July 15, 2022, and then again on September 21, 2022,  Glenn Schubert with the OIG asked Trent Castleberry for an update by the VA regarding filing a complaint with Montana's Board of Nursing regarding Jennifer.  Mr. Castleberry responded:

> All three cases have made it through local process to prepare SLB report file.  These, collectively, are in final review with the facility privacy office before being routed for VISN review.  These are

expected to be submitted for VISN review by end of week,
September 30, 2022.  I am monitoring for their receipt at the VISN
office and encouraging expedited review.

80.     However, even before a final review by VISN, Defendant, through

Agents Jackson and Huntoon, in their August 17, 2022, letter, told the Montana

Nursing Board the following.

"The AIB 'concluded that the allegation of patient abuse against
[R.D.] was substantiated' based on facts involving [   ], and Jennifer
KRANSKY."

81.     Huntoon and Jackson's statements were based largely on the false

statements of Brenda Schwab and Nicole Chavez.

82.     Huntoon and Jackson did not verify whether the allegations against

Jennifer were accurate.

83.     Huntoon and Jackson did not have the discretion or rely upon their

discretion as agents for the VA to report Jennifer to the Montana Nursing Board.

They reported Jennifer under the mandates of VHA Directive 1100.18.

84.     Huntoon and Jackson failed to follow standards, practices, routines,

policies, and guidelines a competent investigator is required to adhere to verify

whether the allegations were supported by the evidence.

85.     Huntoon and Jackson reported Jennifer to the Nursing Board knowing

three Montana prosecutors had reviewed the file and rejected the Defendant's

allegations against Jennifer.

86.    The Assistant U.S. Attorney for Montana refused to prosecute Jennifer for abuse of a veteran due to lack of evidence.

87.    Montana Assistant Attorney General, Mike Flanning, declined to prosecute Jennifer due to lack of evidence that Jennifer abused veterans.

88.    Custer County Attorney Wyatt Glade refused to prosecute Jennifer, stating he had a conflict, although he could have brought in a special prosecutor, as commonly done, if he thought there was enough evidence to move forward.

89.    Huntoon states on page 10 of his report, on December 7, 2021, Jennifer did the following:

> KRANSKY responded and "got right up in his face and pointed at him" telling Dennis not to speak to her staff like that. Chavez began crying and left the scene.

90.    Those who were present for this event will refute Chavez' statement.

91.    Chavez did not cry and leave the scene; nor did Jennifer get "right up in his face and pointed at him" or berate him. At the time of the event, Chavez was outside, across the street from the VA building because she was taking her routine break to smoke a cigarette.

92.    Huntoon and Jackson cannot claim immunity because they violated Jennifer's constitutional rights.

93.    On October 27, 2022, Defendant, through its agent, represented the following at the grievance hearing:

> "At the beginning I said this is a case about patient abuse, and it is.
> But this is not a case about patient abuse committed by Jennifer
> Kransky."

94.     Jackson and Huntoon also told the Nursing Board that Jennifer

did the following:

> KRANSKY was a nurse, and not the nurse manager at the time and
> was alleged to have limited a veteran's eating time to 20 minutes, as
> a punishment, despite the doctor's orders that he be given 30
> minutes.

95.     Jennifer was no even present regarding this event.

96.     Jennifer hired counsel to assist in presenting her defense to the false

allegations made by Defendant to the Nursing Board.

97.     The Nursing Board quickly dismissed the Defendant's complaint, but

the damage was already done to Jennifer's career.

98.     As a direct and proximate result of the tortious acts of Defendant's

agents and employees, the injuries and damages Jennifer sustained include:

personal injuries; past and future pain and suffering; past and future severe mental

anguish; past and future emotional distress; extreme fear; economic damages

including loss of income and diminution in future earning potential and infliction

of physical illness; humiliation, indignities, embarrassment, degradation, and

egregious injury to reputation; personal freedom and physical liberty including but

not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, and personal fulfillment.

## FIRST CAUSE OF ACTION
### Federal Tort Claims Act
### 28 U.S.C. §§¶ 1346 and 2671-2680
### Montana Law:  Infliction of Emotional Distress/ Negligent and Intentional.

99.    Jennifer repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

100.   Defendant's agents and employees' actions directly and proximately caused severe emotional distress to Jennifer.

101.   Defendant's agents' and employees' acts and omissions concerning Jennifer were extreme and outrageous, shocked the conscience, and breached the duty of care they owed to Jennifer.

102.   By the foregoing, Defendant is liable for its agents and employees having substantially caused Defendant's wrongful actions and resulting severe emotional distress, as well as the other grievous damages and injuries set forth above.

103.   No reasonable person should ever have to suffer the type of emotional distress that Jennifer suffered.

104.   Jennifer has suffered and continues to suffer from the emotional distress caused by the Defendant's wrongful acts.

## SECOND CAUSE OF ACTION
### Federal Tort Claims Act
### 28 U.S.C. §§¶ 1346 and 2671-2680
### Montana State Law: Malicious Prosecution

105.   Jennifer repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

106.   As detailed above, Defendant's agents' and employees' history of misconduct  include concealing exculpatory evidence, fabricating inculpatory evidence, and initiating a prosecution that lacked probable cause.

107.   Defendant's agents and employees, knowing that probable cause did not exist to prosecute Jennifer, nonetheless, moved forward and initiated a prosecution of Jennifer.

108.   Defendant's agents and employees, with malice, knew or, in reckless indifference to the truth, should have known that probable cause did not exist to prosecute Jennifer, either criminally or before the State of Montana Board of Nursing.

109.   Defendant's agents and employees, acting individually and in concert knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts, namely that Jennifer did not abuse a veteran.

110.   Defendant's agents and employees committed the foregoing tortious conduct knowingly, intentionally, willfully, recklessly, and with deliberate

indifference to the truth and Jennifer's common-law right to be free from malicious prosecutions.

111.   The prosecution terminated when the Board of Nursing dismissed the complaint.

112.   As a direct and proximate result of the conduct of the Defendant's agents and employees, Jennifer was maliciously prosecuted and suffered damages from the malicious prosecution.

**THIRD CAUSE OF ACTION**
**Federal Tort Claims Act**
**28 U.S.C. §§¶ 1346 and 2671-2680**
**Montana State Law:  Defamation**

113.   Jennifer restates and incorporates by reference each allegation contained in the foregoing paragraphs as fully set forth herein.

114.   The Defendant, through its agents and employees, told multiple state agencies and the public that Jennifer abused veterans.

115.   The Defendant, through its agent and employees recklessly made false and misleading statements, thereby damaging Jennifer.

116.   Jennifer incurred damages from the Defendant's defamatory acts.

//

//

## FOURTH CAUSE OF ACTION
### Federal Tort Claims Act
### 28 U.S.C. §§ 1346 and 2671–2680
### Montana State Law:  Negligence

117.   Jennifer restates and incorporates by reference each allegation contained in the foregoing paragraphs as fully set forth herein.

118.   The Defendant owed a duty to Jennifer to exercise reasonable care regarding its employment relationship with Jennifer.

119.   The Defendants breached its duty of care in the employment relationship with Jennifer.

120.   Defendant's agents and employees owed duties of care to Jennifer that required them to be forthcoming with information in their possession contrary to the allegation she abused veterans.

121.   Specifically, and by way of non-exhaustive example, Defendant's agents and employees created a substantial risk of physical and emotional harm for Jennifer for which a private person would be liable under Montana law by actively participating and concealing, hiding, secreting, manufacturing and denying the existence of material information showing Jennifer did not abuse veterans.

122.   Defendant presentation of false evidence—all for the sake of furthering the aims of diverting attention from the mistreatment and care of Veterans at the Helena VA, and to preserve the employment of others at the VA.

123.    As a result, consequence or cause of a breach of duty by Defendants, Jennifer suffered injury and damages.

124.    The Defendant is liable to Jennifer as a result of their negligent conduct.

## FIFTH CAUSE OF ACTION
### Federal Tort Claims Act
### 28 U.S.C. §§ 1346 and 2671–2680
### Montana State Law:  Retaliation

125.    Jennifer re-alleges and incorporates by reference each allegation contained in the foregoing paragraphs as though fully set forth herein.

126.    Jennifer raised issues with the Helena VA that it was not properly providing care to Veterans because it failed to hire personnel.

127.    Within days after contesting her termination, the Defendant, through its agents and employees, requested three prosecutors with the State of Montana prosecutor Jennifer.  They declined to move forward with prosecuting Jennifer.

128.    The defendants retaliated against Jennifer for her constant requests to the VA to fill positions, and for her contesting her termination.

## SIXTH CAUSE OF ACTION
### Federal Tort Claims Act
### 28 U.S.C. §§ 1346 and 2671–2680
### Montana State Law:  Abuse of Process

129.    The Defendant alleged Jennifer abused veterans or she enabled or implicitly endorsed an environment of abuse.

130. The Defendant instituted criminal and civil prosecutions of Jennifer.

131. Concealing exculpatory evidence not only violated Jennifer's due process under the Montana Constitution but was also an abuse of process by these Defendants.

132. The Defendant put to use a process which it was not intended by initiating criminal and civil prosecutions while concealing evidence of Jennifer's innocence and falsely implicating her.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Jennifer Kransky demands judgment against the above-captioned Defendant as follows:

a. for compensatory damages.

b. for reasonable costs under 28 U.SC §§ 1920 and 2412(a), Federal Rule of Civil Procedure 54(d)(1), and any other applicable laws;

c. for pre- and post-judgment interest as allowed by law; and

d. for such other relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 8th day December 2023.

By: /s/ William A. D'Alton
William A. D'Alton
D'ALTON LAW FIRM, P.C.
*Attorney for Plaintiff Jennifer Kransky*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2023, I electronically filed the

foregoing with the Clerk of the Court for the United States District Court by using

the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

Date: December 8, 2023.

By: /s/ WILLIAM A. D'ALTON
   William A. D'Alton
   D'ALTON LAW FIRM, P.C.
   *Attorney for Plaintiff Jennifer Kransky*